Filed 7/21/25  Marriage of Javanmard and Asgari CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re the Marriage of FATEMEH JAVANMARD and NASER ASGARI. | H051818<br>(Santa Clara County<br> Super. Ct. No. 18FL002209) |
| FATEMEH JAVANMARD,<br><br> Appellant,<br><br> v.<br><br> NASER ASGARI,<br><br> Respondent. | |

## I.    INTRODUCTION

This appeal concerns a postjudgment order in a marital dissolution proceeding involving appellant Fatemeh Javanmard and respondent Naser Asgari.[1]  The parties, pursuant to a prior judgment on reserved issues filed February 9, 2021 (the judgment), were ordered to list their Campbell family residence on Walters Avenue (the Property) for sale.  Subject to credits awarded to Fatemeh, the net sales proceeds were to be divided equally.  The judgment included the following provision:  "Either party shall have the right of first refusal by matching any bonafide [*sic*] offer of purchase within **(3)** days

---

[1] We refer to the parties by their first names for convenience and clarity; we mean no disrespect in doing so.  (See *Rubenstein v. Rubenstein* (2000) 81 Cal.App.4th 1131, 1136, fn. 1.)

while simultaneously submitting conclusive proof of the ability to finalize the transaction within **(30)** days of exercising the right of first refusal." (Original boldface.)

After significant delays, the Property was listed for sale in February 2023, with a provision that excepted any commission obligation "*if right of first refusal is exercised.*" (Original italics.) Two third-party offers were received, one for $2,819,000 (the $2.8 million offer),[2] and the other for $2,700,000 (the $2.7 million offer). Fatemeh timely exercised the right of first refusal to match the terms of the $2.8 million offer. The next day, she and Naser were informed that the potential buyers (offering $2,819,000) had withdrawn their offer—indicating they no longer felt "comfortable moving forward with [it]"—and replaced it with an offer of $2.65 million. Accordingly, Fatemeh then exercised the right of first refusal to match the $2.7 million offer, the then-highest existing offer. In both notices exercising the right of first refusal, Fatemeh stated that she was prepared to pay Naser the net amount due him under the respective third-party offers; she included an accounting of claimed deductions for sellers' costs, and for credits and reimbursements to arrive at the net amount she claimed to be owing to Naser.

A dispute thereafter arose between the parties, principally concerning whether Fatemeh: (1) was entitled to exercise the right of first refusal to match the existing $2.7 million offer or was bound by her exercise of the right of first refusal to match the (revoked) $2.8 million offer; and (2) could deduct sellers' costs that would have been paid in a third-party sale, such as real estate commissions, to arrive at the net amount due Naser in exercising the right of first refusal. Fatemeh filed a request for order (RFO) upon which the court ruled on August 25, 2023. The court in its order reached two conclusions. First, it held—contrary to Fatemeh's position that she was entitled to proceed with her exercise of the right of first refusal to match the $2.7 million offer—that her exercise of the right of first refusal to match the $2.8 million offer controlled.

---

[2] We have rounded downward the offer of $2,819,000 only for simplicity in using a definitional term for the offer.

Second, the court concluded that Fatemeh was not entitled to deduct real estate commissions (required only in the third-party sale) to arrive at the net amount owed Naser under her exercise of the right of first refusal.

First, Fatemeh contends that the trial court erred, both with respect to its express rulings and its failure to decide other issues presented in the RFO. She argues that her exercise of the right of first refusal to match the third-party offer of $2.7 million applies because the $2.8 million offer was revoked and thus was not a bona fide offer that either party could match under the right of first refusal provided in the judgment. Second, Fatemeh contends—contrary to the trial court's decision—that, in determining what constitutes a matching offer made through a right of first refusal, the particular details of the third-party transaction should be considered to ascertain the net proceeds paid to the seller. She argues that if there are sellers' costs that exist only in the third-party transaction—such as under the $2.7 million offer here, where Fatemeh and Naser were required to pay real estate commissions—those costs should be deducted to arrive at the net proceeds payable under a right of first refusal.

We conclude that the trial court erred. Having been revoked by the buyers before its acceptance, the $2.8 million offer was not a bona fide offer, and Fatemeh made a timely exercise of her right of first refusal to match the terms of the highest existing valid proposal (the $2.7 million offer). Further, "a right of first refusal may be exercised without a literal matching of terms . . . [and] the court must consider commercial realities" to determine whether the exercise of the right of first refusal is in essence equivalent to the third-party offer. (*Arden Group, Inc. v. Burk* (1996) 45 Cal.App.4th 1409, 1414-1415 (*Arden Group*).) Here, this means that, contrary to the trial court's decision, Fatemeh may properly deduct from the gross price of $2.7 million any sellers' costs (including commissions) required under the third-party offer that will not be incurred in exercising the right of first refusal to match that offer. Further, we conclude

3

that the court erred by failing to rule on additional matters presented before it under Fatemeh's RFO.

Accordingly, we will reverse the postjudgment order of August 25, 2023. We will remand the case for further proceedings with directions that the trial court: (1) find that Fatemeh made a timely and valid exercise of the right of first refusal granted under the judgment to match the terms of the bona fide $2.7 million offer; (2) determine that in exercising the right of first refusal, Fatemeh is entitled to deduct from the gross price the real estate commissions required as sellers' costs under the $2.7 million offer; (3) determine the amount of additional sellers' costs which Fatemeh is entitled to deduct from the gross price; (4) determine the total amount of allowable credits and reimbursements (including, as appropriate, interest) to which Fatemeh is entitled in exercising the right of first refusal for monies owed by Naser under the judgment and other court orders; (5) determine the ultimate net equalization payment due Naser as a result of Fatemeh's exercise of the right of first refusal to match the bona fide $2.7 million third-party offer; (6) determine whether there is conclusive proof that Fatemeh is able to finalize the transaction within 30 days of her exercise of the right of first refusal; and (7) if appropriate, issue an order requiring Naser to execute an interspousal transfer deed of his interest in the Property.

## II.    PROCEDURAL HISTORY

### A.    Judgment On Reserved Issues (February 9, 2021)

This dissolution proceeding was initiated by Fatemeh on October 11, 2016. The parties separated on the same date. The court entered a judgment (status only) on July 7, 2020.

After a two-day trial on reserved issues, the judgment (captioned "JUDGMENT FOLLOWING TRIAL") was filed on February 9, 2021. The court in the judgment disposed of issues that included: the division of community property and debt; the characterization of assets and obligations as community or separate assets or debt,

4

respectively; the confirmation of separate property; spousal support; and the determination of Fatemeh's request for the imposition of attorney fees as sanctions (Fam. Code, § 271).[3]

The judgment, as it relates to the present appeal, included an order that the parties list the Property for sale at its then-appraised value ($2,350,000). It was ordered that the net proceeds of the sale would be divided equally between the parties, "[s]ubject to the credits awarded to [Fatemeh] as discussed . . . in this Judgment." The parties were ordered that, until close of escrow, they were to share equally the first mortgage, second mortgage, property taxes, and insurance related to the Property.

The provision in the judgment regarding the right of first refusal concerning the Property was as follows: "Either party shall have the right of first refusal by matching any bonafide [*sic*] offer of purchase within **(3)** days while simultaneously submitting conclusive proof of the ability to finalize the transaction within (30) days of exercising the right of first refusal. [¶] The party not exercising the right of first refusal shall vacate the property within **(30)** days after the right of first refusal is exercised." (Original boldface.)[4]

---

[3] All unspecified references are to the Family Code.

[4] Naser filed an appeal from the judgment. (See *In re Marriage of Javanmard and Asgari*, H049086.) The appeal from the judgment was transferred by order of the Supreme Court to the Second District Court of Appeal. The appeal was decided by that court, which affirmed the judgment, specifically rejecting Naser's challenge to the imposition of $50,000 in sanctions against him under section 271. (See *In re Marriage of Javanmard and Asgari* (Jan. 19, 2023, B322861) [nonpub. opn.].) On our own motion, we take judicial notice of this related appeal. (Evid Code, § 459, subd. (a); see also *In re Christy L.* (1986) 187 Cal.App.3d 753, 755, fn. 2.) There were two other related appeals. Naser filed an appeal from an order of $15,000 in sanctions imposed against him in connection with his having filed untimely motions for reconsideration and new trial challenging the judgment. This court affirmed the sanctions order. (See *In re Marriage of Javanmard and Asgari* (Apr. 27, 2023, H049366) [nonpub. opn.].) Naser also appealed an order finding him in contempt and imposing $5,000 in sanctions. (Two of the counts of contempt related to the sale of the Property, namely: (1) Naser's refusal to (continued)

### B.    Fatemeh's Request for Order

#### 1.    The RFO

On or about April 11, 2023,[5] Fatemeh submitted an RFO (request for order). She sought orders: (1) confirming and enforcing the right of first refusal that she claimed to have exercised to match the terms of a bona fide third-party offer of $2,700,000 to purchase the Property; (2) determining the net amount owed by Fatemeh to Naser under her exercise of the right of first refusal; (3) requiring Naser to execute an interspousal grant deed to the Property; and (4) imposing attorney fees as sanctions against Naser under section 271.[6] Fatemeh submitted numerous documents as exhibits in connection with her RFO.

As background, Fatemeh alleged that in the two years since the entry of judgment in February 2021, Naser "ha[d] gone to extraordinary lengths in an attempt to obstruct the court's postjudgment orders of enforcement." (Capitalization and boldface omitted.) Fatemeh asserted that, as it related to the present controversy, Naser had refused to sign a listing agreement to sell the Property. This claimed intransigence caused Fatemeh to file an RFO seeking appointment of the clerk as elisor to sign a listing agreement and other documents Naser had been previously ordered to sign. The court granted this prior RFO on February 9, 2022. It directed Naser to vacate the Property and to reimburse Fatemeh one-half of the mortgage and insurance for the Property she had paid on Naser's behalf. Naser did not comply with the order. On October 10, 2022, the court ordered the

---

list the property; and (2) due to such refusal, his having violated the order that he pay Fatemeh $50,000 in sanctions from the sales proceeds.) This court affirmed that contempt and sanctions order. (See *In re Marriage of Javanmard and Asgari* (Apr. 27, 2023, H049587) [nonpub. opn.].) We take judicial notice of these two related appeals. (See Evid Code, § 459, subd. (a); *In re Christy L.*, *supra*, at p. 755, fn. 2.).

[5] All dates hereafter are 2023 unless otherwise specified.

[6] The issue of Fatemeh's request for attorney fees and sanctions was, by stipulation, deferred to later proceedings.

issuance of a writ of possession for the delivery of the premises to Fatemeh. Naser was evicted from the Property on October 26, 2022.

In November 2022, Nasser Kazemi (a longtime friend of the parties) agreed to be listing agent. Kazemi recommended a listing price for the Property of $2,595,888 based upon three comparable sales. Despite this recommendation (and the fact that the judgment provided that the Property would be listed at its appraised value of $2.35 million), Naser required a listing price of $2,850,000. Fatemeh eventually acceded to Naser's demand in order to get the Property listed.[7] Ultimately, the listing agreement was signed by Naser on February 9, 2023.[8] The listing agreement provided that "[s]ellers['] *retain right of first refusal: No Commission to brokers if right of first refusal is exercised*." (Original italics.) Prior to the listing agreement being signed, Fatemeh had expended $5,734 for repairs and maintenance of the Property; she sought reimbursement of $2,867 in her RFO.

Kazemi conducted a three-day open house from February 18 to 20. On February 21, the parties received, through Kazemi, two offers to buy the Property, namely, the $2.8 million offer and the $2.7 million offer. Kazemi characterized them both as "great offers."

Fatemeh alleged in the RFO that she was not employed and did not personally have the funds to exercise the right of first refusal. She stated, however, that she was able and willing to match the terms of either the $2.8 million offer or the $2.7 million offer

_____

[7] The listing agreement signed by the parties provided for a listing price that was higher than the price identified in the judgment filed two years earlier. At oral argument, both counsel acknowledged that the parties had agreed to list the Property at a price greater than as stated in the judgment. Counsel advised the court further that there was no controversy concerning listing the Property at $2,850,000, and that the other terms of the judgment concerning the listing and sale of the Property controlled.

[8] Fatemeh described various marketing positions taken by Naser that she contended were unreasonable and which delayed further the sale of the Property by three months.

because of the following facts: (a) in the case of the $2.7 million offer, she was entitled to deduct $106,127 from the purchase price for sellers' costs (including real estate commissions of $94,500) that would not be payable through exercise of the right of first refusal;[9] (b) she was entitled to credits based upon the judgment and subsequent court orders requiring payments from Naser (including interest) that totaled $511,165; (c) she had been able to borrow $448,000 from several family members; (d) these credits and borrowed funds totaled $959,165; and (e) after deductions and credits, the net payment due from Fatemeh to Naser by her exercise of the right of first refusal to match the $2.7 million offer was $326,223.

Through a series of e-mails from February 22 to February 24, involving counsel for the parties and Kazemi—presenting a rather complicated chronology of events—Fatemeh alleged that she had made a timely and valid exercise of the right of first refusal to match the terms of the $2.7 million offer. The essential events, as alleged by Fatemeh, were the following:

**February 22 (8:58 a.m.):** Fatemeh requests that Naser advise her of his position regarding the two offers. He does not respond.

**February 23 (4:33 p.m.):** Fatemeh exercises her right of first refusal by indicating her willingness to match the terms of the $2.8 million offer by "match[ing] the net amount due to [Naser] under the terms of [that offer]." She provides a detailed accounting of the credits and funds showing her ability to match the offer.

**February 23 (9:55 p.m.):** Kazemi advises that, per Naser's instructions, Kazemi has prepared a counteroffer of $2.9 million. Thus, Naser has unilaterally rejected the $2.8 million offer.

---

[9] As reflected in a spreadsheet detailing Fatemeh's calculations, there were also deductions of $923,008 from the total price for payoffs of the first and second mortgages against the Property.

**February 24 (9:21 a.m.):** Fatemeh advises Kazemi that she had previously matched the $2.8 million offer and stated the Property should go off the market without further offers or counteroffers.

**February 24 (9:38 a.m.):** Naser states that his "issue is the match price of $2.819M as a bonafide [*sic*] offer, among others."

**February 24 (9:56 a.m.):** Kazemi advises parties that on February 23, the prospective buyers had stated they "did not feel comfortable moving forward with their original [$2.8 million] offer," withdrew that offer, and submitted a new offer of $2,650,000.

**February 24 (10:00 a.m.):** Naser advises he "agreed with" Fatemeh's exercise of her right of first refusal and states he "need[s] to talk about [Fatemeh's] claims."

**February 24 (2:27 p.m.):** Naser advises that "the operable [*sic*] match offer is $2,819,000 as [Fatemeh] noticed [on 2/23], which was accepted by [Naser]."

**February 24 (3:02 p.m.):** Fatemeh confirms that "the operable [*sic*] match offer is based on the February 21, 2023 purchase offer of $2,819,000 and the costs to be paid by seller under that offer," referring to the purchase price and sellers' costs as having been detailed previously.

**February 24 (3:44 p.m.):** Naser states "[t]he seller's costs are part of the claims to be discussed."

**February 24 (4:15 p.m.):** Fatemeh—her counsel having become aware of the prospective buyers' February 23 withdrawal of the $2.8 million offer—exercises her right of first refusal to match the still "valid" $2.7 million offer.

**February 24 (6:24 p.m.):** Naser states that the $2.8 million offer is a bona fide offer and "[a]ny change of circumstances" does not affect its being bona fide; he contends that the $2.8 million offer is the proper offer subject to being matched.

9

Fatemeh's counsel set forth in the RFO a detailed account of his efforts, through correspondence and meetings with opposing counsel between February 24 and April 6, to reach agreement with Naser regarding deductions and credits claimed as part of her exercise of the right of first refusal to match the $2.7 million offer. Fatemeh's counsel also stated that Naser had failed to meet and confer in good faith to reach a resolution of the proper amount of these deductions and credits in calculating the net payment owed to Naser in concluding the exercise of the right of first refusal.

### 2. Opposition

Naser filed papers in opposition to Fatemeh's RFO, including numerous exhibits. He argued that as a matter of contract, Fatemeh and Naser had agreed and "accepted that the $2,819,000 [offer] was a bona fide offer for purposes of setting a value of the house" and "[t]heir consent to enter into the contract was free, mutual and was communicated to each other. . . . There was meeting of the minds that sufficiently created the contract." Naser contended that Fatemeh could not "retract the contract" by later purporting to exercise the right of first refusal to match the terms of the $2.7 million offer.

Naser contended further that it was not appropriate for Fatemeh—as she had indicated she was entitled to do—to deduct the sellers' costs (including brokerage commissions). He argued that the transaction should be "likened to an appraised property for valuation, [and the right of first refusal] should [be based on] only . . . the price thereof." Naser asserted that there should be no deduction because "costs are absent in [this] case as the buyout would be [on a] cash basis. . . ."[10]

### 3. Order

A video hearing (apparently unreported) on Fatemeh's RFO took place on May 22 before Sharon L. Roper, Temporary Judge. The court reviewed the parties' pleadings and

---

[10] In his opposition filed below, Naser presented no legal authority in support of this argument.

exhibits and heard argument of counsel. After submission of the case, the court filed its order on August 25.

In its order, the court concluded that Fatemeh had exercised the right of first refusal to match the $2.8 million offer, and it would be improper to consider her later purported exercise of the right of first refusal to match the $2.7 million offer. Referring to Fatemeh's first exercise of the right of first refusal as an "offer" to Naser and her second exercise of the right of first refusal as a "modification of the offer," the court held that the exercise of the right of first refusal to match the $2.7 million offer was ineffective because "[Naser] did not accept the modification of the offer proposed by [Fatemeh]."

The court also addressed Fatemeh's position that she was entitled to deduct the real estate commissions that would have been payable had the Property been sold to a third-party buyer under either the $2.8 million offer or the $2.7 million offer. The court held that Fatemeh was not entitled to deduct the commission, concluding that since no commissions would be paid or incurred by either party where Fatemeh exercised the right of first refusal to match the $2.8 million offer, no real estate commissions should "be deducted from [Naser's] share of the sale proceeds."

Fatemeh filed a notice of appeal from the order.

### III. DISCUSSION

#### A. Standard of Review

Matters involving "purely legal question[s]" are reviewed independently. (*Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1191.) In cases in which "the decisive facts are undisputed," the appellate court is "confronted with a question of law and [is] not bound by the findings of the trial court. [Citations.]" (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799; see also *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912 ["the application of law to undisputed facts ordinarily presents a legal question that is reviewed de novo"].)

11

The three main issues in this appeal involve questions of law. First, this court is required to determine whether the trial court erred in holding that Fatemeh could not exercise the right of first refusal as provided in the judgment to match the terms of the $2.7 million offer because she had previously exercised the right of first refusal to match the (later revoked) $2.8 million offer. In addressing this issue, which is based upon facts that are undisputed, we interpret the judgment ordering the sale of the Property and providing the parties with the ancillary right of first refusal to match the terms of any bona fide purchase offer. Interpretation of a judgment "is a question of law subject to a court's de novo review. [Citation.]" (*Dow v. Lassen Irrigation Co.* (2022) 79 Cal.App.5th 308, 326 (*Dow*); see also *Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193, 1205 [" 'interpretation of the effect of a judgment is a question of law within the ambit of the appellate court' "].) Further, to the extent that we address the effectiveness of Fatemeh's exercise of the right of first refusal to match the $2.7 million offer by considering the trial court's contractual analysis based upon undisputed facts, our review is likewise de novo. (See *Reich v. Reich* (2024) 105 Cal.App.5th 1282, 1288 (*Reich*).)

Second, we consider whether Fatemeh, in exercising the right of first refusal by matching the terms of the third-party offer, was entitled to deduct the sellers' cost of real estate commissions from the gross purchase price. Resolution of this issue, also founded on undisputed facts, requires in part that we conduct an independent review by interpreting the judgment. (See *Dow*, *supra*, 79 Cal.App.5th at p. 326.) We must also apply general principles of law concerning rights of first refusal to determine the correctness of the trial court's resolution of a question of law, namely, that Fatemeh, as the holder of a right of first refusal, could not deduct from the purchase price real estate commissions required under the third-party sale. Such a review is de novo. (See *Vosburg v. County of Fresno* (2020) 54 Cal.App.5th 439, 460.)

Third, we address whether the trial court erred in failing to address all essential matters presented in Fatemeh's RFO. This inquiry is also subject to de novo review. (Cf. *Jo Redland Trust, U.A.D. 4-6-05 v. CIT Bank, N.A.* (2023) 92 Cal.App.5th 142, 152 [question of whether trial court properly concluded it was without authority to act is subject to independent review].)

## B.        Adequacy of Appellate Record

Naser asserts that Fatemeh has failed to present an adequate record on appeal. He contends that because Fatemeh has provided neither a reporter's transcript of the RFO hearing nor a settled statement, she cannot demonstrate that the trial court erred.

It is of course true that "the burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment. [Citations.] . . . ' "[I]f the record is inadequate for meaningful review, the appellant defaults and the decision of the trial court should be affirmed." ' [Citation.] 'Consequently, [the appellant] has the burden of providing an adequate record. [Citation.] Failure to provide an adequate record on an issue requires that the issue be resolved against [the appellant].' [Citation.]" (*Jameson v. Desta* (2018) 5 Cal.5th 594, 609, fn. omitted.) And as the California Supreme Court has explained, "[T]he absence of a court reporter at trial court proceedings and the resulting lack of a verbatim record of such proceedings will frequently be fatal to a litigant's ability to have his or her claims of trial court error resolved on the merits by an appellate court." (*Id.* at p. 608.) But the mere fact that the appellant does not produce a reporter's transcript or an alternative settled statement of the proceedings at issue in the appeal does not of itself doom the appellant's review of the trial court's decision. (See *Bel Air Internet, LLC v. Morales* (2018) 20 Cal.App.5th 924, 933-934 (*Bel Air Internet*)

"If an appellant intends to raise any issue that requires consideration of the oral proceedings in the superior court, the record on appeal must include a record of these oral proceedings." (Cal. Rules of Court, rule 8.120(b).) Fatemeh did not include such a

record (either a transcript or settled statement if the hearing was unreported), the inference being that she did *not* intend to raise any issue requiring that this court consider the oral proceedings below. Further, from the appellant's appendix, it appears that the issues concerning the RFO were exhaustively presented in the papers filed by the parties, and that both parties included extensive documentary evidence in support of their respective positions. The court's order itself does not suggest that the parties presented new material, testimony, or other evidence at the hearing.[11] Moreover, as discussed, *ante*, the three main issues requiring resolution in this appeal are subject to our de novo review based upon undisputed facts. Therefore, Naser's conclusory argument that Fatemeh cannot meet her burden of showing error because of the absence of a record of the oral proceedings at the hearing fails. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 [conclusory presentation in appellate brief will result in issue being treated as abandoned].)

In *Bel Air Internet, LLC*, *supra*, 20 Cal.App.5th 924, appellants challenged an order denying their special motion to strike the complaint under the anti-SLAPP statute, Code of Civil Procedure section 425.16. Respondent argued that the appeal should be dismissed due to appellants' failure to procure a reporter's transcript of the hearing. (*Bel Air Internet*, *supra*, at p. 933.) The appellate court rejected the argument, reasoning: "[Respondent] does not claim that the hearing included any live testimony or the introduction of any other evidence. Nor does it identify any particular matter addressed at the hearing that this court must consider to decide the appeal. [Citation.] While a record of the hearing would have been helpful to understand the trial court's reasoning, it is not necessary here where our review is de novo and the appellate record includes

---

[11] The trial court recited in its order that it had "reviewed the exhibits and pleadings submitted by the parties, and heard argument of counsel." The trial court did not refer to any testimony offered by the parties or to evidence not included in the parties' filed pleadings.

the trial court's written orders and all the evidentiary materials germane to Appellants' motion. [Citation.]" (*Id.* at pp. 933-934; see also *Gamma Eta Chapter of Pi Kappa Alpha v. Helvey* (2020) 44 Cal.App.5th 1090, 1098 [because order on motion to compel arbitration was subject to de novo review and all evidence relied on was part of the record, absence of reporter's transcript from unreported hearing was of no consequence]; *Chodos v. Cole* (2012) 210 Cal.App.4th 692, 699 [reporter's transcript not required for appeal unless " 'an appellant intends to raise any issue that requires consideration of the oral proceedings in the superior court' "].)

The record presented by Fatemeh is adequate for this court to decide this appeal.

### C.      Rights of First Refusal Generally

A right of first refusal is one form of a preemptive purchase right which is granted by the landowner in favor of the grantee. (See *Bill Signs Trucking, LLC v. Signs Family Limited Partnership* (2007) 157 Cal.App.4th 1515, 1522-1523 (*Bill Signs*).) It is a " 'conditional right to acquire . . . property, depending on the [owner's] willingness to sell.' [Citation.] The holder of the right merely has the preference to purchase the property over other purchasers if the owner of the property 'elects to sell the property.' [Citation.] The right does not become an option to purchase until the owner of the property voluntarily decides to sell the property and receives a bona fide offer to purchase it from a third party. [Citations.] Normally, the right is enforceable against third persons entering into a contract to buy the property with notice of the holder's right. [Citation.]" (*Campbell v. Alger* (1999) 71 Cal.App.4th 200, 206-207.) The right of first refusal is often seen in the context of a commercial landlord-tenant relationship. (See, e.g., *Bill Signs*, *supra*, at pp. 1522-1523; *Hartzheim v. Valley Land*

15

*& Cattle Co.* (2007) 153 Cal.App.4th 383; *Mitchell v. Exhibition Foods, Inc.* (1986) 184 Cal.App.3d 1033 (*Mitchell*).)[12]

But a right of first refusal is distinguishable from an option, which "is an agreement to keep a specific offer open for a specified period. . . ." (*Arden Group, supra,* 45 Cal.App.4th at p. 1414.) Unlike options, where "disputes about whether the option has been validly exercised are decided by reference to the rules of offer and acceptance— which means the terms of the exercise must ordinarily be identical to terms of the offer . . . [—]no such matching is required for the exercise of a right of first refusal. Although it 'becomes an option of sorts after a bona fide offer to purchase has been made to the owner by a third person' [citation], *a right of first refusal may be exercised without a literal matching of terms. Because the party exercising a right of first refusal is stepping into a contract made by a third party, the court must consider commercial realities and allow modifications consistent with the intent of the parties whose contract created the right of first refusal.* [Citations.]" (*Id.* at pp. 1414-1415, italics added.)

### D. Right of First Refusal to Match Terms of $2.7 Million Offer

In its order, the court below concluded that Fatemeh had exercised the right of first refusal to match the terms of the $2.8 million offer, and that it would be improper to consider the later exercise of her right of first refusal to match the terms of the $2.7 million offer. The court reasoned that after Fatemeh, on February 23 at 4:33 p.m., exercised the right of first refusal to match the terms of the $2.8 million offer, Naser, the next day, "confirm[ed]" that exercise of the right of first refusal, and, "[a]t that point, the elements of a contract between [Fatemeh] and [Naser] for the sale of [Naser's] interest in [the Property] had been satisfied. Both parties were knowledgeable as to the subject of

---

[12] Under the circumstances presented here, the right of first refusal was granted by the court under the terms of the judgment in which it was contemplated that the Property would be listed for sale and sold by the landowners, giving either party the right of first refusal to match a bona fide offer by a third party within three days while submitting conclusive proof of the ability to finalize the transaction within 30 days.

16

their contract, which was the sale of [Naser's] interest in [the Property] to [Fatemeh] with [the Property] valued at $2,819,000. [Fatemeh] made the offer to [Naser], and [Naser] agreed and consented to that offer."

The court observed that after Fatemeh exercised her right of first refusal to match the $2.8 million offer, the parties were advised by the real estate agent, Kazemi, that the prospective buyers had withdrawn the offer. The court explained: "On February 24, 2023, at 4:15 p.m., [Fatemeh's] counsel sent an email to [Naser's] counsel and indicated that [Fatemeh] would no longer match the original offer of $2,819,000, but would, instead, exercise a right of first refusal for the second offer amount of $2,700,000. [Naser] did not accept the modification of the offer proposed by [Fatemeh]."

Because the trial court's conclusion concerning the propriety of Fatemeh's exercise of the right of first refusal to match the terms of the $2.7 million offer involves legal issues based upon undisputed facts, we review the matter de novo. (See *Reich*, *supra*, 105 Cal.App.5th at p. 1288.) For the reasons discussed below, we respectfully disagree with the trial court's conclusion and its supporting reasoning.

The judgment gave either party "the right of first refusal [to] match[] any bonafide [*sic*] offer of purchase [of the Property] within **(3)** days . . . ." (Original boldface.) Here, both the $2.8 million offer and the $2.7 million offer were submitted on February 21 and were communicated by Kazemi to the parties at 4:53 p.m. On February 23 (4:33 p.m.), Fatemeh exercised her right of first refusal to match the terms of the $2.8 million offer. At some time also on February 23, the prospective buyers withdrew the $2.8 million offer—stating that they "did not feel comfortable moving forward with" it—and they replaced it by making a new offer of $2.65 million.[13] Also on February 23—at a time

---

[13] As confirmed by counsel at oral argument, the record does not reflect the time on February 23 that the prospective buyers notified the agent Kazemi of their withdrawal of the $2.8 million offer and the submission of their new offer of $2.65 million. It is thus (continued)

17

unknown but as confirmed by Kazemi at 9:55 p.m.—Naser unilaterally rejected the $2.8 million offer, instructing Kazemi to make a counteroffer of $2.9 million.

An offer "may be revoked at any time before its acceptance is communicated to the proposer, but not afterwards." (Civ. Code, § 1586.) The offeror may replace the offer before it is accepted: "[T]he making of a new offer involving the same subject matter, communicated to the offeree, will end the power to accept the original offer, without using any express words of revocation." (1 Corbin on Contracts (2025) § 2.20, fn. omitted; see also *Prather v. Vasquez* (1958) 162 Cal.App.2d 198, 205 [revocation of gratuitous offer to sell acreage terminated buyer's right to accept offer].) Further, a principal is charged with knowledge of matters of which his or her agent is aware and which the agent, "exercis[ing] . . . ordinary care and diligence," would ordinarily communicate to the principal. (Civ. Code, § 2332.)

Thus, Naser and Fatemeh—as principals of the agent Kazemi—were charged with knowledge that by the end of the day on February 23, the prospective buyers had withdrawn the $2.8 million offer and replaced it with an offer of $2.65 million. (See *Bellasi v. Shackelford* (1962) 201 Cal.App.2d 265, 267-268 [seller's oral notification of revocation communicated to title company acting as agent of both parties was sufficient to revoke offer]; see also *Carr v. Lauritson* (1940) 41 Cal.App.2d 31, 34 [buyer who signed deposit receipt and tendered a deposit was held to have revoked the offer by later advising seller's broker "that he could not 'go through with it' "].) At that point, the $2.8 million offer to buy the Property was revoked, and Fatemeh and Naser, as sellers, were powerless to accept it. Based upon the undisputed evidence, as a matter of law, the

---

conceivable that the prospective buyers may have revoked the $2.8 million offer prior to Fatemeh's exercise of the right of first refusal to match that offer on February 23 at 4:33 p.m.

$2.8 million offer was plainly *not* a bona fide offer. (Cf. *Pellandini v. Valadao* (2003) 113 Cal.App.4th 1315, 1322 ["a bona fide sale for purposes of a right of first refusal does not occur unless there is a transfer for value to a third party"].) The fact that the $2.8 million offer was outstanding (but not accepted) for two days before its revocation does not create a temporary bona fide status that would trigger the exercise of an enforceable right of first refusal to match the terms of that revoked offer.[14]

The trial court reasoned that the right of first refusal exercisable by Fatemeh pertained to a matching of the terms of the $2.8 million offer because she and Naser had arrived at a contractual arrangement for that purpose. But Fatemeh's ability to exercise the right of first refusal to match any bona fide offer was created by the judgment. Nothing contained in the judgment provided or suggested that if, after receipt of a bona fide purchase offer, one party elected to exercise the right of first refusal to match it, the other party could treat that exercise as an offer that could be accepted to form a contract or rejected to render it a nullity. Thus, since Fatemeh's exercise of the right of first refusal to match the $2.8 million was not an offer to Naser, her later (February 24) exercise of the right of first refusal to match the terms of the $2.7 million offer did not constitute a "modification" that Naser had the power to accept or reject.[15]

_____

[14] The court rejected Fatemeh's claim that the $2.8 million offer was not bona fide because of its withdrawal, reasoning that "there was no evidence that . . . the original [$2.8 million] offer could not have been accepted by the parties." However, we conclude the buyers revoked that offer on February 23 before it was accepted by Fatemeh and Naser. Therefore, the undisputed evidence showed that the $2.8 million offer was *not* a bona fide offer.

[15] We likewise disagree with the trial court's analysis that Fatemeh's exercise of the right to match either third-party offer involved "the sale of [Naser's] interest in [the Property]" or that it constituted "the sale of [the Property] . . . directly between the parties." The right of first refusal created by the judgment gave both parties the right to match any bona fide third-party offer to buy the Property. The judgment did not create a contractual right for the sale of one party's interest in the Property to the other.

19

Moreover, even if the judgment had granted Naser the power to accept or reject Fatemeh's exercise of the right of first refusal—which it did not—Naser did *not* "accept" Fatemeh's exercise of the right of first refusal to match the $2.8 million offer upon the terms that she stated (including deduction of sellers' costs and provision for credits and reimbursements). Instead, Naser: (1) communicated to Kazemi (on the evening of February 23) his purported rejection of the prospective buyers' $2.8 million offer by requesting that Kazemi make a counteroffer; (2) advised Fatemeh on February 24 (9:38 a.m.) that his "issue is the match price of $2.819M as a bonafide [sic] offer, among others," and asked whether she would "still [be] exercising/confirming her first refusal" with a proposed $2.9 million counteroffer; (3) advised Fatemeh on February 24 (10:00 a.m.) that he "agreed with" her exercise of the right of first refusal but stated he "need[ed] to talk about [her] claims"; and (4) advised Fatemeh on February 24 (3:44 p.m.) that "[t]he seller's costs are part of the claims to be discussed" with respect to her exercise of the right of first refusal. Naser's communications—assuming he had the power to accept or reject Fatemeh's exercise of the right of first refusal, which he did not—constituted a counteroffer to her purported offer and therefore a rejection of her exercise of the right of first refusal to match the $2.8 million offer. (See *Flintco Pacific, Inc. v. TEC Management Consultants, Inc.* (2016) 1 Cal.App.5th 727, 736 [response by offeree to offer that contained materially different terms was a counteroffer that terminated offeree's power to accept original offer]; see also Civ. Code, § 1585 ["[a] qualified acceptance is a new proposal"].)

Lastly, we address Naser's position on appeal that "[t]he trial court correctly determined the value of the . . . Property to be $2.819 million . . . based on the bona fide offer presented by a third[]party." Elsewhere, Naser argues that "the fair market value"

20

of the Property was $2.819 million as determined by the third-party offer. The trial court made no determination of the fair market value of the Property. To the extent that Naser argues that the $2.8 million offer constituted evidence of the value of the Property, the revocation of that offer disproves his contention. There was no valuation of the Property, and valuation was not an issue in the proceedings below.

The trial court erred in concluding that Fatemeh was contractually bound to her exercise of a right of first refusal to match the terms of the later-revoked $2.8 million offer. Fatemeh, as provided in the judgment, was given "the right of first refusal by matching *any* bonafide [*sic*] offer of purchase" of the Property. (Italics added.) As a matter of law, she properly and timely exercised that right of first refusal to match the terms of the highest bona fide purchase offer that remained outstanding, i.e., the $2.7 million offer.

### E. Deduction of Sellers' Costs—Right of First Refusal

The trial court in its order limited the issue of sellers' costs to whether Fatemeh was "entitled to deduct realtor commissions of 3.500 percent of the gross sales price in her buy-out of [Naser's] interest in [the Property]." (Using the purchase price in the $2.7 million offer, this commission would be $94,500.) The court did not mention or address Fatemeh's claim that she was entitled to deduct other sellers' costs (e.g., escrow fees and title insurance).

The court observed that "the parties' listing agreement provided that no commissions were to be paid if the right of first refusal was exercised by one of the parties." The court then concluded without further elaboration that "[a]s the sale of [the Property] is directly between the parties, and no realtor or broker's commissions are to be paid or incurred by either party, realtor's commissions are not to be deducted from [Naser's] share of the sale proceeds."

21

Fatemeh contends that, in determining the amount that must be tendered to conclude a right of first refusal, the court must look at the net proceeds that will be paid to the seller in the third-party sale that is being matched. In support of her position, Fatemeh relies in significant part upon *C. Robert Nattress & Associates v. CIDCO* (1986) 184 Cal.App.3d 55 (*Nattress*), in which the appellate court concluded that it was proper for the holder of a right of first refusal to deduct from the amount payable the real estate commission that would have been paid by the seller under the third-party sale.[16]

We begin with the principles enunciated by the court in *Arden Group, supra*, 45 Cal.App.4th at page 1414 that a person exercising a right of first refusal need not specify terms that match or are identical to those in the third-party offer. "Because the party exercising a right of first refusal is stepping into a contract made by a third party, *the court must consider commercial realities and allow modifications consistent with the intent of the parties whose contract created the right of first refusal*. [Citations.]" (*Id.* at pp. 1414-1415, italics added.) Therefore, "under California law, the Court must take a common sense approach to review the circumstances and 'commercial realities' of the right of first refusal in order to determine *whether its terms are materially equivalent* to the third-party contract in order to qualify as a contract for sale. [Citation.]" (*Integral Development Corp. v. Tolat* (N.D. Cal., Oct. 25, 2013, No. C 12-06575 JSW) 2013 U.S. Dist. LEXIS 153705, at *6, italics added.)

Thus, in *Arden Group, supra*, 45 Cal.App.4th at pages 1411 to 1413, the gas station owners/lessees exercised a right of first refusal under their lease after a third-party buyer (Buyer) made an offer to purchase the property. Buyer, owner of grocery store chains wishing to use the property for a parking lot, included lessor's obligations for soils

---

[16] We observe that Naser did not address Fatemeh's argument in his opposition filed below or in his respondent's brief.

testing, presale removal of gas tanks, environmental contamination and cleanup, and ongoing liability for post-sale discovery of contamination. (*Id.* at p. 1412.) After the lessees exercised their right of first refusal, the lessor confirmed the exercise, and the parties entered into an agreement confirming the sale on the same terms as the third-party sale with exceptions (no removal of gas tanks, no soil testing, and lessor liability for contamination only if it preceded the lessees' occupancy). (*Id.* at pp. 1412-1413.) In a declaratory relief action challenging the exercise of the right of first refusal, the trial court held that the lessor was obliged to sell the property to Buyer because "the [lessees'] offer did not 'match [the] essential terms' of [Buyer's] offer which 'required that *at the close of escrow* the Property would be *tested for contamination* and would be free from any contamination.' " (*Id.* at p. 1414, original italics.)

The appellate court reversed, concluding that notwithstanding the differences (i.e., the environmental provisions) between the third-party offer and the lessees' exercise of their right of first refusal, the court was required to consider the "commercial realities" of the transactions. (*Arden Group*, *supra*, 45 Cal.App.4th at pp. 1414-1415.) The court explained: "[T]he *only* differences in the two deals are those made necessary by the fact that the [lessees] are buying as tenants in possession who will continue to use the property in the same manner it has been used for more than 50 years. The removal of the tanks, the clean-up arrangements, the testing for contamination, and [the lessor's] continuing clean-up responsibility became non-issues when the [lessees] became the buyers, and the modification of the deal simply acknowledged that fact, no more and no less. Indeed, to carry [Buyer's] position to its logical conclusion would preclude the substitution of the [lessees] as buyers because, under the terms of [the third-party] offer, [Buyer] must be the named buyer. We reject that notion as absurd, and we reject as self-

23

serving nonsense [Buyer's] suggestion that its proposal was 'better' because it has an element of social utility by requiring the immediate clean-up of the property." (*Id.* at p. 1415; see also *Mitchell*, *supra*, 184 Cal.App.3d at pp. 1040-1044 [the court, after considering the reasonable expectations of landlord and tenant, held that commercial tenant's exercise of right of first refusal was proper, despite its deletion of certain provisions in the third-party offer that had no application to tenant].)

In *Nattress*, *supra*, 184 Cal.App.3d 55, the lessee of a commercial building (lessee), held a right of first refusal in the event the lessor chose to sell. (*Id.* at p. 59.) The lessor/owner (owner) obtained an offer to purchase the building from a limited partnership, C. Robert Nattress and Associates (buyer) in which C.R. Nattress (broker) was general partner. (*Ibid.*) The third-party offer totaled $676,382, involving cash of $310,582 (of which $40,582 would be paid by owner directly to broker as a commission), along with the assumption of an existing obligation secured by a trust deed against the property. (*Id.* at pp. 59-60.) Thus, owner would receive $270,000 in cash from the escrow. (*Id.* at p. 60.) Lessee exercised his right of first refusal, with a total purchase price of $635,800, i.e., the purchase price under the third-party offer, less the commission payable to broker. (*Ibid.*) As the *Nattress* court explained, "In cash and debt reduction, therefore, [owner] was to receive the same amount from [lessee] as would have been received if the property were sold to [buyer]." (*Ibid.*) Owner notified broker of lessee's exercise and that the third-party sales agreement was therefore canceled. (*Id.* at p. 61.) Buyer and broker filed suit and prevailed, the trial court concluding, inter alia, that lessee's exercise of the right of first refusal " 'did not match the price or terms of the [third-party offer].' " (*Id.* at p. 62.)

The appellate court reversed. It observed that since owner under the third-party offer would have been required to pay broker a commission of $40,582, "[owner] would receive the same net amount under [lessee's exercise of the right of first refusal] as under

[buyer's] offer." (*Nattress*, *supra*, 184 Cal.App.3d at p. 70.) The court found that because lessee's purchase under the right of first refusal yielded the "same net price" as would have occurred under the third-party offer, it satisfied the lease provision that lessee's purchase be " 'on the same terms and conditions' " as under the third-party offer. (*Ibid.*)[17] The *Nattress* court explained, "Perhaps the most persuasive consideration is the somewhat absurd result that would obtain otherwise: [Lessee] would have had to offer an additional $40,582 which would have gone not to [broker] but to [owner], so that in effect in order to meet the [third-party] offer, [lessee] would have had to make an offer *more favorable to* [*owner*] *than that made by* [*buyer*]. No such result could have been intended by the drafters of the lease provision containing the right of first refusal." (*Id.* at pp. 70-71, italics added.)[18]

In so holding, the appellate court in *Nattress*, *supra*, 184 Cal.App.3d at pages 71 to 72, disagreed with *Hartmann v. Windsor Hotel Co*. (W.Va. 1949) 52 S.E.2d 48 (*Hartmann*). There, a real estate broker sued the owner of a hotel for breach of contract for the commission he would have received in a third-party sale, claiming that the seller had improperly concluded it was required to sell the hotel to the lessee-holder of a right

---

[17] Besides the deduction of the real estate commission, lessee's purchase differed from the third-party offer in that $85,000 of the cash otherwise payable to owner was paid to a creditor of owner in partial satisfaction of a promissory note. (*Nattress*, *supra*, 184 Cal.App.3d at p. 60.) The appellate court concluded that this was not "a real difference" that negatively impacted the exercise of the right of first refusal. (*Id.* at p. 70.)

[18] *Nattress*, *supra*, 184 Cal.App.3d 55 was cited in a California practice guide, in which the authors wrote that when comparing an offer through exercise of a right of first refusal with a third-party offer, "a court may pierce through the particular details and look to the *net proceeds* to be paid the seller to ascertain which offer is better. . . . [I]f the third[-]party offer entails the payment of a broker's commission by the owner, an offer made by the grantee of a right of first refusal which has a lower purchase price but does *not* require the seller to pay a broker's commission is arguably a better 'net' offer which the seller must accept. [Citation.]" (Greenwald & Bank, Cal. Practice Guide: Real Property Transactions (The Rutter Group 2024) ¶ 8:214.)

of first refusal after his exercise of that right at a net price that subtracted the commission. The *Hartmann* court, "[a]pproaching the matter semantically and rather literally, . . . concluded that the amount offered under the right of first refusal was less than the amount offered by the broker's prospective purchaser, so the exercise of the right of first refusal was not on the same terms as the triggering offer and the owner was liable to the broker for payment of the commission. [Citation.]" (*Nattress*, *supra*, at p. 71, fn. omitted.) Describing this holding as a "somewhat mechanistic approach to the problem" (*id.* at p. 72), the *Nattress* court "doubt[ed] that the result yielded by that approach accords with the commercial realities or the expectations of the parties to a lease containing a right of first refusal . . . . On an objective basis the probable expectations of both the lessor and the lessee were that if the lessee made a proposal to exercise the right of first refusal which was exactly the same in net effect to the lessor as the triggering offer, the right of first refusal would be deemed exercised. If the literal matching of terms were required, a triggering offeror could by offering some unique consideration such as existing trust deed notes, a bag of diamonds or a herd of Arabian horses, effectively defeat the lessee's right of first refusal" (*ibid.*).

The court in *Reef v. Bernstein* (Mass.App.Ct. 1987) 504 N.E.2d 374 (*Reef*) reached the same conclusion as the *Nattress* court. In *Reef*, the court held that, although the third-party sale required the seller to pay a commission from the sales proceeds, where there was no agreement requiring it if the property was sold to the lessee-holder of the right of first refusal, the seller was not required to pay the broker. (*Reef, supra,* at p. 376.) Relying on *Nattress*, *supra*, 184 Cal.App.3d at pages 70 to 73, the *Reef* court found that the holder of the right of first refusal could deduct the broker's commission from the sales price in the third-party offer. (*Reef*, *supra*, at p. 376.) The court explained: "The expectation of the parties to the instrument giving rise to the right of first refusal is that the services of a broker will not be needed, and that no broker's commission will be payable. [Citation.] . . . [¶] What the seller views as his price is the

26

amount to be received after the deduction of any commission; 'his expectation is that the money for the payment of commission will come out of the proceeds of the sale.' [Citations.] The tenant, for his part, does not intend that the seller receive a windfall because the tenant, rather than a third party, is the buyer. He considers that the seller should be put in the same position as if he had accepted the triggering offer." (*Id*. at pp. 376-377.)

We agree with *Nattress*, *supra*, 184 Cal.App.3d 55, and find the court's reasoning to be persuasive.[19] Here, the party electing to exercise the right of first refusal provided in the judgment to "match[] any bonafide [*sic*] offer of purchase" was not required to match, term-for-term, each obligation of the $2.7 million offer. (See *Arden Group, supra*, 45 Cal.App.4th at p. 1414 ["a right of first refusal may be exercised without a literal matching of terms"].) Such a literal matching would require Fatemeh, in exercising the right of first refusal, to match numerous terms in the third-party offer having no relevance to the transaction she initiated, including: establishing an escrow, making a deposit, obtaining a loan of 62.96 percent of the gross purchase price, procuring title insurance, obtaining a home warranty, and reaching agreement upon escrow instructions. Moreover, a literal matching would mean that Fatemeh would effectively be "paying for" real estate commissions that were *expressly excluded* under the parties'

---

[19] Naser did not address *Nattress*, *supra*, 184 Cal.App.3d 55 either in his opposition below or in his respondent's brief. The trial court did not mention *Nattress* in its order. At oral argument, Naser's attorney argued that the principles enunciated in *Nattress* concerning the right of a party exercising a right of first refusal to deduct real estate commissions payable in a third-party sale have no application because the transaction here occurred in the context of the division of community property in a dissolution proceeding. The position has no merit. There is no basis for treating Fatemeh's exercise of a right of first refusal any differently than it would be treated in an ordinary civil proceeding.

listing agreement where one party exercised the right of first refusal to match any bona fide offer.[20]

Nor was Fatemeh, in exercising the right of first refusal to match the $2.7 million offer, required to match the *purchase price* stated in that offer. The judgment granted the parties the right of first refusal to "match[] any bonafide [*sic*] *offer of purchase*." (Italics added.) Civil Code section 2079.13, subdivision (i) defines " '[o]ffer to purchase' " as "a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller."[21] In contrast, " '[o]ffering price' " is defined as "the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property." (Civ. Code, § 2079.13, subd. (h).) Had the court intended that the party exercising the right of first refusal was required to match *the specific purchase price* stated in the third-party offer to purchase, it could have readily used the language "offering price" or similar language, instead of "offer of purchase," in the judgment.[22]

Rather than the specific purchase price in the third-party offer, Fatemeh, in exercising the right of first refusal, was required to tender an amount which would yield the "same net price" as would have occurred had the $2.7 million offer been accepted and

---

[20] The listing agreement provided: "*Sellers retain right of first refusal; [n]o Commission to brokers if right of first refusal is exercised.*" (Original italics.)

[21] We find no meaningful distinction between the term "offer *of* purchase" used in the judgment, and "offer *to* purchase" defined in Civil Code section 2079.13, subdivision (i) (italics added). (Cf. *J&A Mash & Barrel, LLC v. Superior Court* (2022) 74 Cal.App.5th 1, 37 [interchangeable use of "offer to purchase" and "purchase offer"].)

[22] The trial court referred to Fatemeh's exercise of the right of first refusal to match the third-party offer as "her buy-out of [Naser's] interest in [the Property]." While the ultimate result of her matching the terms of the $2.7 million offer would be a payment of net proceeds to Naser and his delivery of an interspousal transfer deed of his interest in the Property, Fatemeh's exercise of the right of first refusal and her thereby stepping into the shoes of the third-party buyers is not technically a buyout of Naser's interest in the sense that there was an agreement between the parties under which Fatemeh would purchase Naser's equity through an appraisal of the fair market value of the Property.

the sale concluded. (*Nattress*, *supra*, 184 Cal.App.3d at p. 70.) This approach is not only consistent with *Nattress*; it is in harmony with the terms of the judgment. The court ordered the parties to list the Property for sale, with "the net proceeds from the sale . . . be[ing] divided equally between the parties." With Fatemeh exercising the right of first refusal to match the $2.7 million offer and thereby "stepping into a contract made by a third party" (*Arden Group*, *supra*, 45 Cal.App.4th at p. 1414), she cannot be expected to pay an amount that would result in net proceeds to the recipient *greater than* those anticipated under the third-party sale. Requiring Fatemeh to match the gross purchase price would lead to an absurd result: Naser would receive a net amount *greater than* what he would have received had the sale under the bona fide $2.7 million offer concluded. Thus, rather than matching the third-party offer, Fatemeh would be *improving upon it*.

Naser argues the deduction of commissions from the amount due based upon the exercise of the right of first refusal under the judgment to match any bona fide offer would provide Fatemeh with a discount in the sale of the family residence, and that this discount is prohibited under section 2550, requiring the equal division of marital assets. The argument has no merit. The judgment provided for the equal division of the Property and specified a mechanism for its achievement—the parties' listing the Property for sale, dividing the sales proceeds equally (subject to credits awarded to Fatemeh), and giving the parties the right of first refusal to match any bona fide offer. Any challenge to the division of the Property as provided in the judgment should have been asserted in the separate appeal brought by Naser and decided by the Court of Appeal. (See fn. 4, *ante*.) Further, the deduction of real estate commissions from the offering price in the $2.7 million offer that Fatemeh has elected to match by exercising the right of first refusal is not providing a discount to either party or effecting an unequal division of marital property. To the contrary, inclusion of sellers' costs such as commissions that will not be incurred through Fatemeh's exercise of the right of first refusal would foster

29

an *unequal* division by providing Naser with net funds *greater than* what he would receive in a third-party sale.

Independently viewing the terms of the judgment providing for the sale of the Property and granting the parties the ancillary right of first refusal, and "consider[ing] commercial realities" (*Arden Group, supra*, 45 Cal.App.4th at pp. 1414-1415), we conclude that Fatemeh may deduct the 3.5 percent real estate commissions payable under the $2.7 million offer in exercising her right of first refusal to match the terms of that bona fide third-party offer.

### F.      Remaining Issues to be Decided on Remand

There are several matters presented in Fatemeh's RFO besides the two issues discussed at length above. They were not addressed by the trial court in its order. Upon remand, the trial court is directed to consider and decide the following issues:

### 1.      *Deduction of Additional Sellers' Costs*

Fatemeh presented evidence in her RFO that, aside from significant real estate commissions, there were additional sellers' costs totaling $12,548,[23] such as title insurance, that would have been incurred by the parties had the $2.7 million offer been accepted. She itemized these costs and averred that they would not be incurred through her exercise of the right of first refusal to match the third-party offer, and therefore should be deducted from the gross amount of the third-party offer.

Based upon the authorities discussed above (see, e.g., *Arden Group, supra*, 45 Cal.App.4th 1409; *Nattress, supra*, 184 Cal.App.3d 55), upon proper proof of additional sellers' costs under the $2.7 million offer that would not be incurred through Fatemeh's exercise of the right of first refusal to match the terms of that offer, the court should confirm that they may be deducted by Fatemeh.

---

[23] According to the accounting submitted by Fatemeh, these additional sellers' costs consisted of prorated property taxes ($2,106), escrow fees ($2,464), title insurance ($4,308), Santa Clara County transfer taxes ($2,970), and home warranty cost ($700).

## 2. *Allowable Credits and Reimbursements Under Court Orders*

Fatemeh asserted in the RFO that, in determining the net amount due through her exercise of the right of first refusal to match the terms of the $2.7 million offer, she was entitled to credits for monies owed by Naser under the judgment and other orders of the court, as well as reimbursements for one-half of the costs of preparing the Property for sale. She alleged that the total amount of these credits and reimbursements (including interest), as of February 28, 2023, totaled $511,165.[24]

The judgment provided that "[s]*ubject to the credits awarded to [Fatemeh] as discussed later in this Judgment*, the net proceeds from the sale of [the Property] shall be divided equally between the parties." (Italics added.) Through her exercise of the right of first refusal, Fatemeh has "stepp[ed] into a contract made by a third party." (*Arden Group*, *supra*, 45 Cal.App.4th at p. 1414.) As a substitute to a third-party sale of the Property, the judgment provides that in Fatemeh's exercise of the right of first refusal, she is permitted to subtract from the net proceeds owed to Naser the credits for payments due from Naser that are specified in the judgment. From our review of the record, it does not appear that Naser has objected, either below, or on appeal, to an application of credits against the net amount he should receive from Fatemeh's exercise of the right of first refusal for monies owed by Naser (1) under the judgment, (2) under other court orders, or (3) for reimbursements for Property expenses incurred by Fatemeh beyond her share. The court on remand should determine the amount of those credits and reimbursements.

---

[24] The judgment alone identifies credits due Fatemeh from Naser, exclusive of any accrued interest, that totaled $299,714 ($155,963 total equalization payment, $93,751 total unpaid temporary spousal support from September 19, 2018 to December 13, 2020, and $50,000 monetary sanctions). In a revised accounting filed in May 2023 shortly before the hearing, Fatemeh indicated that the total of the claims and reimbursements from the judgment, other orders, and advances for the Property, was $510,464. On remand, Fatemeh will be required to update her accounting, including calculation of interest, inclusion of any additional payments relative to the Property for which she claims reimbursement, and verification of funds available to her to consummate the exercise of the right of first refusal to match the $2.7 million offer.

### 3. *Net Equalization Payment Due*

Fatemeh contended in her RFO that, after deduction of sellers' costs and after accounting for credits and reimbursements, the net payment due to Naser through her exercise of the right of first refusal to match the $2.7 million offer was $326,223.[25] She sought an order from the court determining the net amount due to Naser. On remand, the court—after deduction of real estate commissions, determination and deduction of other sellers' costs, and determination and application of appropriate credits and reimbursements for monies owed by Naser to Fatemeh—should determine the net payment due from Fatemeh to Naser pursuant to her exercise of the right of first refusal to match the $2.7 million offer.

### 4. *Proof of Ability to Finalize Transaction*

Fatemeh alleged in the RFO that, based upon borrowed funds of $448,000 and deductions, credits, and reimbursements, she had proved conclusively, as required in the judgment, that she was able to finalize the transaction within 30 days of her exercise of the right of first refusal. Upon making the appropriate determinations stated above, the court should make a finding as to whether Fatemeh has provided conclusive proof (as required under the judgment) of her ability to complete the transaction based upon her exercise of the right of first refusal to match the $2.7 million offer.

### 5. *Interspousal Transfer Deed*

Assuming it determines that Fatemeh conclusively proved her ability to conclude the transaction, the court should, pursuant to her request in the RFO, issue an appropriate order requiring Naser to execute an interspousal transfer deed of his interest in the Property.

---

[25] Fatemeh updated this figure in May 2023 as being $324,508. This court anticipates that, on remand, the figure would be subject to further updating.

## IV.    DISPOSITION

The postjudgment order of August 25, 2023, is reversed.  The matter is remanded for further proceedings consistent with this opinion, and the trial court is directed to: (1) find that appellant, under the judgment, made a timely and valid exercise of the right of first refusal contained in the judgment filed February 9, 2021, to match the terms of the bona fide third-party offer of $2,700,000 dated February 21, 2023; (2) determine that in exercising the right of first refusal, Fatemeh is entitled to deduct from the gross price the real estate commissions ($94,500) required as sellers' costs under the $2,700,000 offer; (3) determine the amount of additional sellers' costs which Fatemeh is entitled to deduct from the gross price; (4) determine the total amount of allowable credits and reimbursements (including, as appropriate, accrued interest) owing by Naser under the judgment and other orders to which Fatemeh is entitled in exercising the right of first refusal; (5) determine the ultimate net equalization payment due Naser (after deduction of sellers' costs and providing for credits and reimbursements); (6) determine whether there is conclusive proof that Fatemeh is able to finalize the transaction within 30 days of her exercise of the right of first refusal; and (7) if appropriate, issue an order requiring Naser to execute an interspousal transfer deed of his interest in the Property.

Statutory costs on appeal are awarded to appellant.

_____

WILSON, J.

WE CONCUR:

_____

GREENWOOD, P.J.

_____

DANNER, J.

*Javanmard v. Asgari*
H051818